W. W. FOOTE, Appellee, v. STATE SAVINGS BANK OF MISSOURI VALLEY, Appellant.

JUDGMENT: Vacation—Fraud of Judgment Plaintiff. A judgment entered against a defendant after plaintiff, for a sinister purpose, had assured defendant that he would not be held on his indorsement of the note in question, and after plaintiff had induced defendant to forego reimbursing himself by a settlement with the maker of the note, will be deemed fraudulent and set aside accordingly. (See Book of Anno., Vol. 1, Sec. 12787, Anno. 35 *et seq.*)

Headnote 1: 34 C. J. p. 477 (Anno.)

*Appeal from Harrison District Court.*—O. D. WHEELER, Judge.

JANUARY 19, 1926.

SUIT to cancel a judgment for fraud. Plaintiff was granted the relief prayed for, and the defendant appeals.—*Affirmed.*

*R. J. Organ,* for appellant.

*Robertson & Havens,* for appellee.

MORLING, J.—Plaintiff and Brown, automobile dealers, sold Moats a car, receiving $1,000 in cash and taking Moats's note for the balance, $1,400. This note was sold and indorsed by the plaintiff to the defendant, and it is upon the note and plaintiff's indorsement of it that the judgment attacked by this suit was recovered. An original notice, dated July 12, 1920, of suit by the present defendant against both Moats and Foote on this note and indorsement was served during that month, and required appearance at the term beginning August 31, 1920. Plaintiff never made any appearance, but no judgment was entered against him until July, 1921. No explanation of this delay, or of any delay, is made, except such as may be gathered from the facts which will be related.

Mr. Welch, attorney for Moats, testifies that he thinks he entered his appearance the first day of the term. He says he wanted some delay, to see if he could do something; that Moats had said he was going to see if he could turn the car in on the note. On November 20, 1920, Moats filed answer, and the same day judgment was rendered against him. It is undisputed that the plaintiff and McEvoy, the president of the defendant, had a conversation concerning the note. The evidence is in conflict as to when this conversation occurred. McEvoy says it was before the suit was commenced, and that he never had any other conversation with plaintiff until about the time the present suit was started, in January, 1923. Plaintiff says he always had it in mind that the talk was before any notice was served, but he also says that it was after he was sick in November, 1920. The conversation certainly occurred long before the judgment was taken against the plaintiff, and, as will appear, plaintiff was induced by what then occurred to refrain from making a defense; and the circumstances make it probable that it was before return day. Moats testifies that he got notice from the

bank, went to plaintiff (he was then sick), and told him that he couldn't pay the note, and told plaintiff to take the car, and, if it wouldn't pay the note, he would make up the difference; that plaintiff said he would see what he could do.

Moats says that later he saw Brown, and "told him I had a pretty severe notice, and I couldn't meet that note, and would give him a good trade. I would give him the car back, and pay the difference. Brown said he would go to the bank and see what he could do. When he came back, he said that they [the bank] claimed that they owned the note, and they would take care of the note, and that he [Brown] could not get it, or something like that. * * * I went in to see Mr. McEvoy, and told him I could make settlement with Mr. Foote, and he got provoked at me, and says: 'That note is mine. They ain't got a thing to do with it. You have got to make settlement with me. * * * You have got to settle it here.' I told them I could settle with them, but I could not settle with him. It was a big note, and I couldn't pay it in cash. Mr. McEvoy got angry. I did not owe him [McEvoy] any other notes. My son and Albert Hairsine owed some other notes. McEvoy said in that conversation, 'If you will get behind Clay and help him out with that, we will be able to make some settlement with Mr. Foote,' or something like that. * * * I said I would not (referring to getting behind my son). I told Mr. McEvoy I would not get mixed up in it. The next February I filed a petition in bankruptcy."

Brown says that Moats told him he could not pay for the car, but would turn it back; that the bank wanted their money, and he couldn't pay it; that he (Brown) then talked to McEvoy, and that McEvoy said "we didn't have to take care of the note." He further testifies:

"He had a hog deal on with Mr. Moats, and he wanted to collect for the hogs at the same time, and for me not to take the car. So I could not take up the note, and so I went back and told Mr. Moats that."

Brown says that he was ready, and so told McEvoy to write a check and pay the note, and went down there to get the note from Moats. Plaintiff says that Moats wanted to turn the car

back and take up the note, and that he had a talk with McEvoy, in which the latter said:

" 'Moats is here, going to try and make a settlement with you. Don't you make any settlement with Mr. Moats at all. We have got that note. I am going to make all of the settlement with Moats myself. I have got Moats just where I want him.' * * * I says, 'All right, I will not make any settlement with Mr. Moats.' * * * About fifteen or thirty minutes after that, Mr. Moats came in and brought the car that I had taken in the note for. The car was in good shape. * * * It was practically as good as when I sold it to him."

He further testifies that Moats told him that he would turn the car in, and, if it didn't bring enough to pay the note, he would pay the difference; that he told Moats that he had sold the note to the bank, and the bank wanted Moats to settle with them. Plaintiff says that he said to McEvoy: .

" 'How does it come you are suing me on this note?' He said, 'I am not going to sue you at all. We are doing it to make it legal.' 'I won't pay any attention to this notice at all?' He said, 'No, that's all right; we are going to sue Moats.' I never did anything more with it, or thought any more about it. * * * He said I did not have to pay any more attention to it at all, because they were not going to sue me whatever."

Plaintiff says:

"The reason I did not make any effort to get the car from Moats was because Mr. McEvoy said we were released on the note, and he would take care of it, and that left us out."

Plaintiff had no other talk with McEvoy, and knew nothing about the judgment until he was asked to consent to a release on Moats's property, about the time this suit was brought.

McEvoy admits having one conversation, as stated, with the plaintiff, but denies the testimony of the plaintiff and of Brown and of Moats and of Welch as to what his conversations with them were, and says he told plaintiff he would have to pay the note.

The only explanation of plaintiff's giving no attention to the case by appearance or answer, or of his not taking back the car and collecting the balance of the note, is that given by him and by Brown, Moats, and Welch. Defendant stresses plain-

tiff's testimony that the talk with McEvoy was after plaintiff was sick in November. But plaintiff also says that the occasion of his seeing McEvoy was Moats's statement to him that the bank was demanding payment of the note. Such demand must have been before November, 1920. Defendant contends that the talk with McEvoy was before suit was brought. The plaintiff testifies that he said to McEvoy, ''How does it come you are suing me on this note?'' From all of the evidence, we are satisfied that the conversations in question were brought about by the commencement of the action, and occurred before the day on which defendant was required to answer.

It is apparent, we think, that the defendant was endeavoring to make use of the Moats note to compel Moats to settle a claim that the bank held against Moats's son and Hairsine; that the defendant knew that Moats was willing to turn back the car, but, to serve its own purpose, induced plaintiff and Brown not to settle with Moats. Defendant then took separate judgment against Moats. Moats shortly afterward went into bankruptcy. Plaintiff thereby lost the opportunity of getting back the car and of collecting from Moats the balance of the note. On the facts shown, the judgment was fraudulently procured. Its cancellation and injunction against its enforcement are remedies within the general jurisdiction of a court of equity, to which the plaintiff is entitled, in the absence of a remedy at law. *Rogers v. Gwinn,* 21 Iowa 58; *Baker v. Redd,* 44 Iowa 179; *Bingman v. Clark,* 178 Iowa 1129; *Frisbie v. Chase,* 161 Iowa 133; 2 Pomeroy's Equity Jurisprudence (4th Ed.), Section 919; 34 Corpus Juris 477.

If the plaintiff had discovered the judgment in time, he could have petitioned for a new trial, under Section 4091 of the Code of 1897. That remedy, however, was not open to him, because not commenced within one year. Section 4094. No reason is shown why defendant did not undertake immediate collection of the judgment, if it obtained it in good faith and was not conscious of any fraud in procuring it. No reason is shown why the plaintiff should have discovered the judgment earlier than he did. Defendant will not be heard to say that plaintiff ought not to have believed the statements that its president, in the execution of his duties, made to him, or that

plaintiff ought to have understood or suspected that the defendant was intending to perpetrate a fraud upon him. The loss of his remedy by petition for new trial was not because of plaintiff's negligence, but was the continuing result of the defendant's fraud. The argument that a defendant asking to have a judgment set aside must show a meritorious defense, and that the note was valid, and that the agreement not to take judgment was without consideration, is beside the mark. The defendant, to serve its own purpose, induced the plaintiff not to take back the car and collect the balance of the note from Moats, on the claim that it would settle with Moats and would not look to the plaintiff, and that plaintiff should not pay any attention to the suit. Plaintiff acted accordingly, lost his right of reimbursement; and defendant is estopped from contesting the binding force of the agreement. See *White v. Walker,* 31 Ill. 422; *Harris v. Brooks,* 21 Pick. (Mass.) 195 (32 Am. Dec. 254); *Seymour v. Oelrichs,* 156 Cal. 782 (106 Pac. 88).

The judgment is—*Affirmed.*

De Graff, C. J., and Evans and Albert, JJ., concur.